**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAVISHANKER NARAYANAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff<br><br>v.<br><br>MAREX GROUP PLC, IAN LOWITT, and ROBERT IRVIN,<br><br>Defendants. | Case No. 1:25-cv-08393-RA-SDA<br><br>[rel. 1:25-cv-08368-RA-SDA]<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS**
**<u>OF THE FEDERAL SECURITIES LAWS</u>**

Lead Plaintiffs Ali Shahsavanpour and Jaimin Patel ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on the investigation of counsel, which included a review of Marex Group plc's public filings with the U.S. Securities and Exchange Commission (the "SEC"), press releases, investor presentations, earnings-call transcripts, analyst reports, news and media coverage, and market and securities data.

## NATURE OF THE ACTION

1. This is a federal securities class action against Marex Group plc ("Marex" or the "Company"), its Chief Executive Officer Ian Theo Lowitt ("Lowitt"), and its Chief Financial Officer Crispin Robert John Irvin ("Irvin" and, together with Lowitt, the "Individual Defendants"; collectively with Marex, "Defendants"). Plaintiffs bring this action on behalf of themselves and all other persons and entities that purchased or otherwise acquired Marex ordinary shares between November 7, 2024 and August 5, 2025, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Marex is a diversified global financial services platform that provides liquidity, market access, and infrastructure services to clients in energy, commodities, and financial markets. Its ordinary shares trade on the Nasdaq Global Select Market under the ticker "MRX." The Company completed its initial public offering in April 2024, and during the Class Period also conducted a secondary follow-on offering, which priced on April 17, 2025 at $35.50 per ordinary share.

3. The misrepresentations at issue concern Marex's "Market Making" segment. In quarterly earnings releases throughout the Class Period, Marex reported a "Securities" revenue line for that segment (the "Securities Revenues") alongside a key performance indicator ("KPI") labeled "Marex volumes: Financials" (the "Financials Volume KPI"). Marex told investors that its KPIs provided useful information by "showing the growth of our business across the periods presented," and described Market Making as a spread-based, low-proprietary-risk business. On the Company's November 7, 2024 earnings call, Lowitt personally taught investors to compare volumes and revenues on a segment-by-segment basis, describing Market Making as delivering year-to-date volumes up 46% on revenues up 46%. Taken together, those disclosures told investors that Marex's reported Securities revenue was being generated by the same kind of exchange-traded, spread-based activity the published KPI measured. That distinction mattered because a reasonable investor would value a spread-based, exchange-traded revenue stream differently from revenue generated by proprietary trading, securities financing, inventory, or other balance-sheet-intensive activity because it is lower-risk and less volatile. By presenting the Securities business as the former rather than the latter, Defendants made Marex's revenue mix appear higher-quality, less risky, less, more scalable, and more profitable than it was, and thereby artificially inflated the price of Marex ordinary shares.

4. That was misleading. In reality, the Financials Volume KPI captured only the exchange-traded component of Marex's Securities business (the "Exchange Volumes"). The reported Securities Revenues, by contrast, included a broader set of activities not captured by the published KPI, including stock lending and other non-exchange-traded or otherwise unmeasured activity (the "Off-Exchange Activities"), including corporate bond market making to the extent not captured by the published metric. Marex later confirmed that the published KPI "applied only

to the exchange-traded component" of a broader activity set that included "corporate bond market making, stock loan, and various other activities," and that the exchange-traded business the KPI measured was "being wound down." Investors were not told that the revenue line and the volume line were measuring materially different universes of activity or that the exchange-traded business the published metric tracked was a shrinking business. As a result, Marex's Securities revenue appeared to come from a healthier and more valuable business segment than the one actually generating it.

5. The truth emerged in August 2025, when NINGI Research published a report that synthesized Marex's own public filings and highlighted, among other things, the disconnect between the reported Securities Revenues and the Financials Volume KPI, including the per-contract economics implied by Marex's own published figures. The NINGI Report revealed that Marex's Securities Revenues were being generated largely by Off-Exchange Activities, including stock lending, corporate bond market making and related OTC activity, that the Financials Volume KPI, by Marex's own definition, did not measure. On this news, Marex's ordinary shares fell from $37.64 at the close on August 4, 2025 to $35.31 at the close on August 5, 2025, a single-day decline of approximately 6.2%, on materially elevated trading volume over four times the previous day's. On August 6, 2025, the shares closed at $34.89, producing a cumulative two-day close-to-close decline of approximately 7.3%.

6. Shortly thereafter, Marex's senior executives scrambled to address the facts that the Class Period quarterly materials omitted. On August 13, 2025, during Marex's second-quarter 2025 earnings call, Lowitt was forced to come clean and admitted that the Financials Volume KPI "applie[d] only to the exchange-traded component" of a "broad set of activities" that also included "corporate bond market making, stock loan, and various other activity"; and that Marex had

"removed this volume KPI in the first quarter of 2025" because it was "no longer a useful comparison to our revenue." And rather than a growing, thriving aspect of the business, the exchange-traded business the volume metric measured was "being wound down." In other words, Marex's C-Suite confirmed precisely what NINGI Research had uncovered.

7. Defendants knew, or were reckless in not knowing, that the Class Period statements concerning Securities Revenues and the Financials Volume KPI were materially false and misleading. As alleged in Section D below, Individual Defendants held day-to-day management responsibility for Marex's segment reporting and investor communications. Marex's own Class Period filings placed the stock lending and corporate bond activity Lowitt would later publicly place inside Market Making in different segments entirely. Marex's senior management personally presented Investor Day materials mid-Class Period that identified the scope mismatch between the Financials Volume KPI and the revenue-line product mix. And four senior Marex officers filed discretionary, non-plan Form 144 sale notices in the ten days between Marex's FY 2024 Earnings Release and its March 21, 2025 Form 20-F filing.

**JURISDICTION AND VENUE**

8. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

9. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Marex's ordinary shares trade on the Nasdaq Global Select Market, which maintains facilities within this District. Marex conducts substantial business in this District through U.S. subsidiaries engaged in regulated financial-services operations, and acts

giving rise to the violations alleged herein, including the preparation and dissemination of the materially false and misleading statements alleged herein, occurred in substantial part in this District.

11. In connection with the acts, conduct, and transactions alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone and internet communications, and the facilities of a national securities exchange.

## PARTIES

12. Plaintiff Ali Shahsavanpour purchased Marex ordinary shares at artificially inflated prices during the Class Period and was damaged when the relevant truth was revealed, as set forth in the certification and loss chart previously filed in support of Plaintiff's motion for appointment as lead plaintiff.

13. Plaintiff Jaimin Patel purchased Marex ordinary shares at artificially inflated prices during the Class Period and was damaged when the relevant truth was revealed, as set forth in the certification and loss chart previously filed in support of Plaintiff's motion for appointment as lead plaintiff.

14. By Order dated February 2, 2026 (Dkt. No. 41), the Court appointed Ali Shahsavanpour and Jaimin Patel as Lead Plaintiffs and approved their selection of Lead Counsel.

15. Defendant Marex Group plc is a public limited company organized under the laws of England and Wales, with its principal offices at 155 Bishopsgate, London EC2M 3TQ, United Kingdom. Marex's ordinary shares are registered under Section 12(b) of the Exchange Act and trade on the Nasdaq Global Select Market under the symbol "MRX."

16. Defendant Ian Theo Lowitt has been Marex's Chief Executive Officer since 2016, and a board member and Executive Director since 2012, through the present.

17. Defendant Crispin Robert John Irvin has been Marex's Chief Financial Officer since April 2023, and a board member since May 2023, through the present.

18. Defendants Lowitt and Irvin, by reason of their senior executive positions, their direct involvement in Marex's financial reporting and investor communications, and their execution of Marex's SEC certifications, each possessed the power and authority to control, and in fact did control, the contents of the Company's Class Period SEC filings, press releases, investor presentations, and earnings-call statements, received copies of those materials before or shortly after issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Mislead Investors Regarding Marex's Securities Revenues

19. Marex operates through four reportable operating segments: Clearing; Agency and Execution; Market Making; and Hedging and Investment Solutions, plus a Corporate function. Marex's 2024 Annual Report described the Market Making segment as follows: "The Group acts as principal to provide direct market pricing to professional and wholesale counterparties, primarily within the metals, agriculture, energy and financial securities markets. The Market Making segment primarily generates revenue through charging a spread between buying and selling prices, without taking significant proprietary risk." (2024 Annual Report, Note 5, at 178.) That segment description was material because reasonable investors would value a spread-based, low-proprietary-risk revenue stream differently from a business driven by securities financing, inventory, or other balance-sheet-intensive activity.

20. Through the fourth quarter of 2024, Marex's quarterly earnings releases reported Market Making revenue by asset class (Metals, Agriculture, Energy, and Securities) in a "Performance by Segment" table alongside a contract-volume KPI by asset class labeled "Marex

volumes." (*See*, *e.g.*, Q3 2024 Earnings Release at 11; FY 2024 Earnings Release at 9.) In each release, Marex defined its "Market volumes: Financials" metric (the "Financials Volume KPI") to include "Financial securities (corporate bonds, equities, FX, repo, volatility)" traded on a named list of seven exchanges (CBOE, CBOT, CME, Eurex, Euronext, ICE, SGX). The Financials Volume KPI thus was defined to include only exchange-traded activity on those named exchanges, and did not include the Off-Exchange Activities. Marex told investors in the same releases that "we believe that these KPIs provide useful information to both management and investors by showing the growth of our business across the periods presented."

21. In the Q3 2024 and FY 2024 Earnings Releases, Marex's Market Making segment performance table reported revenue by asset class in one section of the table and Marex's own contract volume by asset class in another section of the same table, structured in both sections by the same four asset classes. (*See* Q3 2024 Earnings Release at 7; FY 2024 Earnings Release at 9.) The Securities revenue line and the corresponding "Marex volumes: Financials" line appeared in the same segment performance table for the same quarterly period, inviting a reader to match the fourth-position revenue line against the fourth-position volume line as revenue and volume measures of the same business. Through the table, Marex led investors to understand that the published Securities revenue and the Financials Volume KPI were measures of the same business, when in fact, as Defendants later confirmed, the revenue line included a broader set of activities that the published KPI did not measure.

22. Furthering this misleading impression, the Q3 2024 Earnings Release described the Securities revenue increase as "primarily reflecting a stronger performance from Equities and FX," two of the exchange-traded asset classes within the Financials Volume KPI's defined scope. (Q3 2024 Earnings Release at 8.) Marex's defined-terms section in each Class Period quarterly release

expressly defined "Market volumes: Financials" to mean "Financial securities (corporate bonds, equities, FX, repo, volatility)" traded on a named list of seven exchanges. (*See* Q3 2024 Earnings Release, App. 1, at 15; FY 2024 Earnings Release, App. 1, at 15.) The Financials Volume KPI therefore measured only exchange-traded activity. As Lowitt later confirmed, the "Market Making – Securities" revenue line Marex paired with that volume KPI captured a broader set of activity than the KPI itself measured, including stock loan, corporate bond market making, and other activity outside the KPI's exchange-traded scope. Marex did not disclose that scope difference, did not tell investors that the volume line and the Securities revenue line covered different categories of activity, and nevertheless told investors that its KPIs provided useful information showing the growth of its business across the periods presented. Marex's August 2025 admission that the paired volume metric was "no longer a useful comparison to our revenue" confirmed that Marex itself understood during the Class Period that investors were making the comparison the defined-terms section and paired tables invited them to make.

23. In the Q3 2024 Earnings Release (furnished to the SEC on Form 6-K on November 7, 2024, signed by Irvin), Marex reported that, for the three months ended September 30, 2024, Securities revenue was $10.4 million compared with $4.4 million in the prior-year quarter, while the Financials Volume KPI was 0.4 million contracts compared with 1.4 million. (Q3 2024 Earnings Release at 8.) The release did not tell investors that the Financials Volume KPI measured only the exchange-traded component of the Securities business or that the Off-Exchange Activities were included in the Securities revenues. The release also said nothing about a broader activity set generating Securities revenue, even though the side-by-side presentation invited investors to compare the published volume and revenue figures.

24. Similarly, in the FY 2024 Earnings Release (furnished to the SEC on Form 6-K on March 6, 2025, signed by Irvin), Marex reported that, for the three months ended December 31, 2024, Securities revenue was $10.4 million compared with $3.4 million in the prior-year quarter, while the Financials Volume KPI was 0.2 million contracts compared with 1.4 million. (FY 2024 Earnings Release at 9.) The release again did not tell investors that the Financials Volume KPI measured only the exchange-traded component of the Securities business or that the rising Securities revenue was being generated by activities, including stock lending and other Off-Exchange Activities, not captured by the published metric.

25. The prior-period comparatives reported in the Q3 2024 and FY 2024 Earnings Releases reflected a substantially different relationship between the volumes KPI and Securities revenues than the figures Marex reported for Q3 2024 and Q4 2024 themselves. The numbers therefore reflected a dramatic apparent increase in per-contract profitability — a per-contract economic trajectory that, if accepted at face value, suggested an exchange-traded Securities business with extraordinary and improving margins, and that materially affected how investors and analysts modeled Marex's future revenue and valued its shares.

26. On April 2, 2025, Marex hosted an Investor Day at the Nasdaq MarketSite in New York. Senior leadership attended, including Lowitt, Irvin, and Paolo Tonucci, Chief Strategist and CEO Capital Markets. (Marex Apr. 2, 2025 Form 6-K, Ex. 99.1.) The Investor Day materials show that Defendants had, during the Class Period, the very information needed to explain the scope mismatch they had left undisclosed in the quarterly releases. A Market Making presentation delivered at the Investor Day depicted the Financials subsegment of Market Making revenue as comprising an Equity sub-line (UK Small Cap Equity and Investment Trusts) and a Fixed Income sub-line (Corporate Bonds), totaling approximately 17% (approximately $36 million) of Market

Making revenue. (Investor Day, Market Making deck, slide 47.) The Investor Day materials thus contained information sufficient to identify the scope difference between the published volume metric and the product mix generating the revenue line, but Marex did not pair that information with the prior Class Period paired KPI/revenue presentations or use it to correct them. A separate Investor Day slide titled "Focus on producers and consumers of commodities" identified representative clients for each of the Metals, Agriculture, Energy, and Environmentals subsegments of Market Making, but did not include the Financials subsegment. (Investor Day, Market Making deck, slide 51.) Marex used the labels "Securities" and "Financials" interchangeably across the Investor Day materials and its quarterly earnings releases to refer to the same Market Making subsegment. Notwithstanding what the Investor Day materials showed, Defendants did not tell investors at Investor Day that the Securities revenue reported in the Q3 2024 Earnings Release or the FY 2024 Earnings Release included material activity outside the Financials Volume KPI; did not retract or explain the paired KPI/revenue presentations in those prior releases; did not explain the implied per-contract economics that appeared on the face of the paired figures; and did not disclose the facts Lowitt would later confirm on August 13, 2025, including that the exchange-traded business the Financials Volume KPI measured was being wound down. Investors who had purchased Marex ordinary shares in reliance on the Q3 2024 Earnings Release and the FY 2024 Earnings Release had already paid inflated prices by the time Investor Day occurred.

27. On May 15, 2025, Marex furnished its first-quarter 2025 earnings release as Exhibit 99.1 to a Form 6-K signed by Irvin. (Q1 2025 Earnings Release, attached as Ex. 99.1 to Form 6-K filed May 15, 2025.) That release no longer contained the Market Making volume rows (Metals, Agriculture, Energy, and Financials) that Marex had published in every prior Class Period

quarterly release, although it continued to publish a rolling twelve-month "Marex volumes: Securities" KPI for Agency and Execution elsewhere in the same release. Marex removed those Market Making volume rows without explanation, without retracting or reconciling the paired Securities revenue and Financials Volume KPI presentations in the Q3 2024 Earnings Release and the FY 2024 Earnings Release, and without telling investors that the prior presentations had been incomplete.

28. Marex's segment description of Market Making, that the segment "primarily generates revenue through charging a spread between buying and selling prices, without taking significant proprietary risk," was materially misleading, or at minimum materially incomplete, as applied to the Securities / Financials line during the challenged quarters. (2024 Annual Report, Note 5, at 178.) Marex was not required to catalog every product in a segment description. But once Marex chose to describe Market Making in spread-based, low-proprietary-risk terms while simultaneously pairing total Securities revenue with a KPI that measured only the exchange-traded component of that business, Defendants omitted facts necessary to make that description fair and not misleading. As Defendants later confirmed, the published KPI captured only the exchange-traded component of a broader activity set that included stock loan, corporate bond market making, and other activity outside the metric's published scope. Marex's own Class Period disclosures elsewhere attributed stock lending and certain fixed-income activity to Agency and Execution and Hedging and Investment Solutions, deepening the misleading impression that the Market Making – Securities line reflected the exchange-traded, spread-based business the published KPI appeared to describe.

29. On August 5, 2025, NINGI Research published a report titled "Marex Group plc: A Financial House of Cards" (the "NINGI Report"). NINGI alleged that Marex labeled the same

subsegment of Market Making interchangeably as "Securities" or "Financials" across its various filings, presentations, and earnings releases while continuing to publish a Financials Volume KPI that, by its own terms, measured only exchange-traded volumes. Among other things, NINGI alleged that the resulting paired presentation produced per-contract economics divorced from operating reality. NINGI characterized the combination of growing per-contract profitability, collapsing exchange volumes, and selective Investor Day disclosure as creating an "irreconcilable contradiction."

30. Marex subsequently effectively admitted the scope mismatch the NINGI Report had identified. On August 13, 2025, during Marex's Q2 2025 earnings call, Lowitt confirmed that the Market Making – Securities revenue line encompassed a broader activity set than the published Financials Volume KPI measured. In his prepared remarks responding to the report, Lowitt told investors: "Within Market Making [and] Capital Markets, we include not just the equity option market making, which uses the Luxembourg fund, but also other businesses including our corporate bond market making, stock loan, and various other activities." (Q2 2025 Earnings Call Tr., Aug. 13, 2025.) Those are Off-Exchange Activities. Lowitt further acknowledged that the Financials Volume KPI, the quarterly volume line Marex had been publishing in the tables along with its Securities revenue, did not measure those Off-Exchange Activities. He stated that "[t]he volume cited in the [NINGI] report applied only to the exchange-traded component of this broad set of activities." (*Id.*) And he admitted that Marex "removed this volume KPI in the first quarter of 2025 as we believed it was no longer a useful comparison to our revenue." (*Id.*) Irvin attended the same call and separately stated that "[v]olumes on exchanges don't capture volumes from businesses such as equities, repos, prime services, and other OTC activities, which are part of our revenues." (*Id.*) In other words, what NINGI told the market on August 5, 2025 was that the Market

Making segment's reported revenue had been driven by Off-Exchange Activities that Marex's published Financials Volume KPI did not capture throughout the Class Period.

31. On the same August 13, 2025 call, Irvin separately confirmed from the CFO's perspective that Marex's published volume lines did not capture the full activity producing Marex's revenues. Discussing Slide 10 of the Q2 2025 investor presentation, Irvin told investors: "There's also activity that flows through the revenue line that is not included in the volumes. . . . Volumes on exchanges don't capture volumes from businesses such as equities, repos, prime services, and other OTC activities, which are part of our revenues." (Q2 2025 Earnings Call Tr., Aug. 13, 2025.) Irvin's admission that Marex's exchange-volume lines did not capture equities, repos, prime services, or OTC activity is consistent with Lowitt's same-call admission that Market Making included "stock loan, and various other activities" that the Financials Volume KPI did not measure. Before August 5, 2025, Marex had not told investors that the Class Period paired KPI/revenue presentations included activity Marex's own volume line did not capture.

32. Also on that August 13, 2025 call, Lowitt suggested that Marex had previously "disclosed" the role of Off-Exchange Activities in Market Making revenue. (Q2 2025 Earnings Call Tr., Aug. 13, 2025.) Throughout the Class Period, Marex never made a disclosure that corrected the Q3 and Q4 2024 quarterly KPI pairing by telling investors that stock loan, corporate bond market making, and other Off-Exchange Activities were included within the Market Making – Securities revenue line while excluded from the published Financials Volume KPI; nor did Marex tell investors during the Class Period that the exchange-traded business the Exchange Volumes measured was being wound down.

33. On the contrary, Marex's own Class Period disclosures elsewhere associated the same kinds of activity later invoked by Lowitt (stock lending and certain fixed-income / corporate-

bond activity) with segments other than Market Making, reinforcing the impression created by the Market Making KPI pairing rather than dispelling it. In the 2024 Annual Report, Marex stated: "Fixed income securities are corporate bonds which are invested in as a part of the Group's Agency and Execution and Hedging and Investment Solutions segments." (2024 Annual Report, Note 18, at 202.) In the same Annual Report, Marex stated: "Equity instruments are purchased primarily to facilitate the stock lending and borrowing business, which is part of the agency and execution business segment." (2024 Annual Report, Note 32(c), at 218.) And the balance-sheet commentary in the same 2024 Annual Report stated that "Securities balances increased to $6.5bn, up $2.4bn from December 2023 driven by hedging activity to support our prime brokerage clients and increased stock lending activity within our Agency and Execution business." (2024 Annual Report at 35.) These disclosures did not tell investors that no such activity could ever contribute to Market Making revenue. They did, however, reinforce the investor-facing impression that the Market Making – Securities line corresponded to the exchange-traded, spread-based activity reflected in the published KPI, rather than to stock lending and other activity Marex elsewhere associated with other segments.

34. The misstatements and omissions alleged above were material to investors as, among other things, they concerned the nature, composition, and quality of a principal source of Marex's reported revenue and earnings during the Class Period and would have altered the total mix of information available to a reasonable investor considering a purchase or sale of Marex ordinary shares.

**B. <u>Summary of False Statements</u>**

Without limitation to any of the allegations above, the following table summarizes the principal misrepresentations, omissions, and misleading statements alleged in Section A above:

| Date | Document | Speaker / Signatory | Summary of Misrepresentations, Omissions and Misleading Statements |
|---|---|---|---|
| Nov. 7, 2024 | Q3 2024 Earnings Release (Form 6-K, Ex. 99.1) | Irvin (signatory) | **Paired KPI/revenue table (Q3 2024 Earnings Release, "Performance by Segment," at 9):**<br>In a single quarterly "Performance by Segment" table published in the earnings release, Marex reported "Market Making – Securities" revenue of "$10.4m" for the three months ended September 30, 2024 on one line and reported "Marex volumes: Financials" of "0.4m" contracts for the same three-month period on another line, with the two lines presented in the same table for the same period.<br>**Omission accompanying the paired KPI/revenue table:**<br>The table did not disclose that the "Marex volumes: Financials" line measured only exchange-traded volume on seven named exchanges, while the "Market Making – Securities" revenue line included Off-Exchange Activities (stock lending, corporate bond market making, and other OTC activities) that the volume line did not capture at all.<br>**Securities growth narrative (Q3 2024 Earnings Release, Market Making segment narrative, at 9):**<br>"Revenue from securities also grew significantly by $6m primarily reflecting a stronger performance from Equities and FX."<br>**Omission accompanying the securities growth narrative:**<br>The release did not disclose that the Securities revenue line included material activity outside the Financials Volume KPI, including stock lending and other Off-Exchange Activities not captured by the published metric.<br>**KPI-usefulness representation (Q3 2024 Earnings Release, defined-terms / KPI section, App. 1, at p. 15):**<br>Marex represented: "we believe that these KPIs provide useful information to both management and investors by showing the growth of our business across the periods presented."<br>**"Market Volumes: Financials" defined term (Q3 2024 Earnings Release, App. 1, at p. 15):**<br>Marex defined "Market Volumes: Financials" as "Financial securities (corporate bonds, equities, FX, repo, volatility) on CBOE, CBOT, CME, Eurex, Euronext, ICE, SGX." |
| Mar. 6, 2025 | FY 2024 Earnings Release (Form 6-K, Ex. 99.1) | Irvin (signatory) | **Paired KPI/revenue table (FY 2024 Earnings Release, "Performance by Segment," at 9):**<br>In the same quarterly "Performance by Segment" table format, for the three months ended December 31, 2024, Marex reported "Market Making – Securities" revenue of "$10.4m" on one line and reported |

| Date | Document | Speaker / Signatory | Summary of Misrepresentations, Omissions and Misleading Statements |
|---|---|---|---|
| | | | "Marex volumes: Financials" of "0.2m" contracts on another line, with the two lines presented in the same table for the same period.<br><br>**Omission accompanying the paired KPI/revenue table:** Same scope mismatch; the table again did not disclose that the volume line measured only exchange-traded volume while the Securities revenue line included Off-Exchange Activities not captured by the volume line.<br><br>**Securities growth narrative (FY 2024 Earnings Release, Market Making segment narrative, at 9):** "Revenue from Securities also grew primarily reflecting a stronger performance from Equities."<br><br>**Omission accompanying the securities growth narrative:** The release did not disclose that the Securities revenue line included material activity outside the Financials Volume KPI, including stock lending and other Off-Exchange Activities not captured by the published metric.<br><br>**KPI-usefulness representation and defined term (FY 2024 Earnings Release, App. 1, at p. 15):** Marex repeated the "useful information" representation and the "Market Volumes: Financials" defined term quoted above. |
| Mar. 21, 2025 | Annual Report on Form 20-F (SOX §302 certifications filed as Exs. 12.1 and 12.2; SOX §906 certification filed as Ex. 13.1); same-day Form 6-K furnishing the 2024 Annual Report and Accounts as Ex. 99.1 | Lowitt (signatory of Form 20-F and individual §302 certification); Irvin (signatory of Form 20-F and individual §302 certification); Lowitt and Irvin jointly (§906 certification) | **Market Making segment description (2024 Annual Report, Note 5 — Segment Reporting, at 178):** "The Group acts as principal to provide direct market pricing to professional and wholesale counterparties, primarily within the metals, agriculture, energy and financial securities markets. The Market Making segment primarily generates revenue through charging a spread between buying and selling prices, without taking significant proprietary risk."<br><br>**Omission accompanying the segment description:** The 2024 Annual Report did not disclose that a material and growing share of the segment's reported revenue was being generated by stock lending and other non-spread Off-Exchange Activities.<br><br>**Capital Markets allocation (2024 Annual Report at 222–223):** The 2024 Annual Report attributed stock lending and other Securities Financing businesses to the Agency & Execution segment, and described the Capital Markets product lines housed in Market Making as comprising the Equity Market Making desk, Frontier FX, Interest |

| Date | Document | Speaker / Signatory | Summary of Misrepresentations, Omissions and Misleading Statements |
|---|---|---|---|
| | | | Rate Swaps, Corporate Bonds, Delta One Total Return Futures and the Volatility Performance Fund.<br>**Fixed-income attribution (2024 Annual Report, Note 18, at 202):** "Fixed income securities are corporate bonds which are invested in as a part of the Group's Agency and Execution and Hedging and Investment Solutions segments."<br>**Stock-lending attribution (2024 Annual Report, Note 32(c), at 218):** "Equity instruments are purchased primarily to facilitate the stock lending and borrowing business, which is part of the agency and execution business segment."<br>**Balance-sheet commentary (2024 Annual Report at 35):** "Securities balances increased to $6.5bn, up $2.4bn from December 2023 driven by hedging activity to support our prime brokerage clients and increased stock lending activity within our Agency and Execution business."<br>**Omission accompanying the attributions above:** Collectively, these representations associated stock lending, corporate bonds, and other Securities Financing activities with segments other than Market Making, and the 2024 Annual Report did not disclose that Lowitt would later describe Market Making as including corporate bond market making, stock loan, and various other activities outside the published Financials Volume KPI.<br>**SOX §302 certifications (Form 20-F, Exs. 12.1 and 12.2):** Each of Lowitt and Irvin represented that, "based on [his] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."<br>**SOX §906 certification (Form 20-F, Ex. 13.1):** Lowitt and Irvin jointly executed the §906 certification. |
| Apr. 2, 2025 | Investor Day slide presentations (presented live at the Nasdaq MarketSite and made available through Marex's investor-relations | Lowitt, Irvin, and Tonucci (Marex's senior-leadership representatives at the event, per Marex's | **Market Making subsegment slide (April 2, 2025 Investor Day Deck, slide 47):** Attributed approximately 17% (approximately $36 million) of Market Making revenue to a "Financials" subsegment comprising an Equity sub-line (UK Small Cap Equity and Investment Trusts) and a Fixed Income sub-line (Corporate Bonds).<br>**Omissions accompanying the attribution above:** |

| Date | Document | Speaker / Signatory | Summary of Misrepresentations, Omissions and Misleading Statements |
|---|---|---|---|
| | website at ir.marex.com) | April 2, 2025 press release furnished as Ex. 99.1 to Form 6-K) | The Investor Day slide presentations did not disclose that the Securities revenue reported alongside the Financials Volume KPI in the Q3 2024 Earnings Release and the FY 2024 Earnings Release was being driven by the Off-Exchange Activities that the Financials Volume KPI did not measure; did not retract, correct, or explain the paired KPI/revenue presentations in the Q3 2024 Earnings Release or the FY 2024 Earnings Release; did not tell investors the paired KPI/revenue presentations in those releases were misleading; did not disclose that the exchange-traded business the Financials Volume KPI measured was being wound down; and — notwithstanding that a separate Investor Day slide identified representative clients for every other Market Making subsegment (Metals, Agriculture, Energy, and Environmentals), no clients were identified for the 'Financials' subsegment.. |

## C. <u>The Truth Is Revealed Causing Significant Losses to Plaintiffs and The Class</u>

35. Defendants' materially false and misleading statements and omissions directly and proximately caused economic losses to Plaintiffs and the Class. Throughout the Class Period, Marex's ordinary shares traded at prices artificially inflated by the misrepresentations alleged herein, including by presenting Marex's Securities business as a higher-quality, more scalable, and more profitable exchange-traded market-making franchise than it was in reality. Plaintiffs and members of the Class purchased Marex ordinary shares at those artificially inflated prices and were damaged when the relevant truth was revealed.

36. On August 5, 2025, NINGI Research published a report that synthesized Marex's own public filings and revealed the significance of facts Defendants had omitted from the challenged quarterly presentations. Among other things, the NINGI Report performed the same comparison of volumes and revenues that Lowitt had taught investors to make on November 7, 2024, but supplied the omitted context which uncovered the truth Defendants had never disclosed: that the published "Marex volumes: Financials" metric captured only the exchange-traded

component of a broader Securities business, while the reported Securities revenue reflected a broader activity set with materially different economics. The NINGI Report highlighted the disconnect between the reported Securities-business revenue and the published metric, computed the per-contract economics implied by Marex's own figures, and disclosed to the market that the Q3 and Q4 2024 KPI/revenue pairings were not measuring the same underlying activity. On this news, Marex's ordinary shares fell from $37.64 at the close on August 4, 2025 to $35.31 at the close on August 5, 2025, a single-day decline of approximately 6.2%, on materially elevated trading volume. On August 6, 2025, the shares closed at $34.89, producing a cumulative two-day close-to-close decline of approximately 7.3%. The stock remained below its pre-NINGI level through the close on August 7, 2025.

37. Marex's August 13, 2025 earnings call confirmed the market significance of the August 5 disclosure. On that call, Lowitt stated that the challenged volume KPI "applied only to the exchange-traded component" of a broader activity set; that Marex had "removed this volume KPI in the first quarter of 2025" because "it was no longer a useful comparison to our revenue"; and that the exchange-traded business the KPI measured was "being wound down." (Q2 2025 Earnings Call Tr., Aug. 13, 2025.) Those statements confirmed that the Q3 and Q4 2024 quarterly materials had paired a partial metric with broader revenue without disclosing the mismatch.

38. On the same August 13, 2025 call, in response to an analyst's question about the sustainability of Marex's Securities revenue growth in the context of softening exchange volumes, Lowitt told investors that Marex was not "anticipating the same level of growth throughout the securities business." (Q2 2025 Earnings Call Tr., Aug. 13, 2025.) Lowitt's forward-looking concession that Marex's Securities growth rates would not continue — made on the same call where he admitted that the Financials Volume KPI "applied only to the exchange-traded

component" of a broader set of Market Making activities and that the exchange-traded component was "being wound down" — confirmed to the market that the high-growth Securities narrative Marex had presented during the Class Period, paired with a contracting exchange-volume KPI, was not sustainable on its stated terms.

39. Before August 5, 2025, Marex did not tell investors that the published metric captured only the exchange-traded component of a broader activity set, did not retract the Q3 and Q4 2024 paired KPI/revenue presentations, and did not correct the impression those presentations had created. Marex's August 13, 2025 statements were its first public confirmation of the facts the NINGI Report had synthesized.

### D. <u>Additional Scienter Allegations</u>

40. Defendants knew, or were reckless in not knowing, that the Class Period statements concerning Marex's Market Making – Securities revenue line and the Financials Volume KPI were materially false and misleading. The composition of the Securities Revenues, the scope of the Financials Volume KPI, and the mismatch between what the revenue line reflected and what the KPI measured were subjects Defendants spoke to, disclosed, certified, and managed on a day-to-day basis throughout the Class Period. The facts alleged in this section support a strong inference that Defendants made, signed, and allowed Marex to publish the challenged statements with actual knowledge of the mismatch, or at a minimum with recklessness amounting to an extreme departure from the standards of ordinary care, a danger of misleading investors that was known to Defendants or so obvious that Defendants must have been aware of it. The allegations that follow are drawn from Marex's own Class Period filings, Marex's own Class Period earnings calls, Marex's own Investor Day materials, and Marex's own statements in the immediate aftermath of the Class Period.

41. The Market Making segment was one of Marex's four reportable operating segments, and Market Making – Securities was a line within that segment that Defendants repeatedly highlighted as contributing to growth during the Class Period. Under IFRS 8, a company's reportable segments are required to correspond to the components of the business whose operating results are "regularly reviewed by the entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance." (IFRS 8.5.) Marex's 2024 Annual Report identifies Marex's chief operating decision maker as "the Group's Executive Committee," which, by Marex's own disclosure, "regularly reviews the Group's operating results in order to assess performance and to allocate resources." (2024 Annual Report, Note 5, at 178.) Lowitt and Irvin were members of the Executive Committee throughout the Class Period. Irvin, as Chief Financial Officer, was additionally responsible for the preparation of Marex's segment reporting on both an internal management-accounts basis and an external financial-reporting basis. In their capacities as CEO and CFO, Lowitt and Irvin reviewed and approved Marex's quarterly earnings materials before issuance; received and responded to analyst questions concerning Market Making composition and Securities revenue drivers on each Class Period earnings call; and, in Irvin's case, signed each of the Class Period quarterly earnings releases furnished to the SEC on Form 6-K. Both Lowitt and Irvin signed Marex's 2024 Form 20-F. (Form 20-F, filed Mar. 21, 2025.)

42. Marex's 2024 Annual Report further discloses that the express activities of Marex's Audit and Compliance Committee during 2024 included "approving the Interim Financial Statements and Quarterly Earnings Results" and monitoring "the integrity of [Marex's] financial statements and related disclosures." (2024 Annual Report, Audit and Compliance Committee, at 104.) Lowitt and Irvin were standing attendees at Audit and Compliance Committee meetings

throughout the Class Period, and the Committee received quarterly Finance updates from Irvin as CFO. (*Id.*) The Committee's standing approval role over the quarterly earnings results, together with Lowitt's and Irvin's standing attendance, placed the KPI presentations challenged here squarely within an internal review process in which both Individual Defendants participated.

43. Marex's 2024 Annual Report additionally credits Irvin, in connection with its assessment of Irvin's 2024 bonus targets, with having "embedded quarterly reporting within the finance department, including all the necessary controls, to support external announcements to the market." (2024 Annual Report, Directors' Remuneration Report, at approx. 128.) That allegation is probative because it ties Irvin personally to the quarterly reporting architecture that produced the challenged KPI presentation. It is not plausible that Irvin embedded the controls supporting Marex's quarterly external announcements without knowing what activity the reported Securities revenue captured and what activity the published Financials Volume KPI did not. The composition of Market Making – Securities revenue, what activities it captured and how those activities related to the volumes Marex was reporting alongside it, was not a peripheral matter buried in a footnote. It was a core operational fact about one of Marex's reportable operating segments, falling squarely within each Individual Defendant's day-to-day management responsibilities. It is not plausible that Lowitt and Irvin reviewed, approved, spoke to, signed, and certified Marex's public reporting on Market Making – Securities throughout the Class Period without knowing what activities generated the revenue they were reporting.

44. Lowitt's own public statements on the November 7, 2024 third-quarter 2024 earnings call confirm that knowledge. Discussing Slide 10 of Marex's investor presentation—showing Marex's volumes and revenues against market volumes by business segment, Lowitt told investors: "Market Making saw volumes up 22% in the market, while Marex saw revenues up 46%

on volumes up by 46%." (Q3 2024 Earnings Call Tr., Nov. 7, 2024.) Lowitt added, as a firm-wide forward-looking statement about client mix, that "[a]s we attract additional larger clients to grow share, we expect our volumes to grow somewhat faster than our revenues." (*Id.*) Lowitt's Market Making volume-to-revenue representation concealed a divergence that was already present within the Market Making – Securities sub-line on the same day: the Q3 2024 Earnings Release furnished to the SEC on November 7, 2024 reported Market Making – Securities revenue up 136% year-over-year on a Financials Volume KPI down 71% year-over-year for the quarter, and year-to-date revenue up approximately 14% on year-to-date volume down approximately 64%. (Q3 2024 Earnings Release at 11, attached as Ex. 99.1 to Form 6-K filed Nov. 7, 2024.) The aggregate Market Making volume-to-revenue picture Lowitt presented on the call did not reflect that sub-line relationship.

45. One quarter later, on March 6, 2025, Marex's FY 2024 Earnings Release reported Market Making – Securities revenue up 206% year-over-year against a Financials Volume KPI down 86%, a further inversion of the Market Making volume-to-revenue relationship Lowitt had represented to investors on November 7. (FY 2024 Earnings Release at 9, attached as Ex. 99.1 to Form 6-K filed Mar. 6, 2025.) Neither Lowitt nor Irvin explained the inversion to investors. Neither disclosed that the Financials Volume KPI captured only the exchange-traded component of the Securities business. Neither disclosed that the Off-Exchange Activities generating the reported revenue fell outside what the KPI measured. Lowitt's Market Making volume-to-revenue representation on November 7, 2024 and his and Irvin's silence on the deepening divergence a quarter later on disclosures the same two signed and certified support a strong inference that Lowitt and Irvin knew the relationship had inverted at the Securities sub-line level and knew why.

46. On the same March 6, 2025 earnings call, Lowitt and Irvin demonstrated both the capability and the willingness to disaggregate Market Making revenue at the asset-class level when it suited them to do so. An analyst asked Lowitt and Irvin about Market Making – Metals, noting that "revenues dropped off pretty significantly there," and asked what had driven "the weak fourth quarter." (Q4 2024 Earnings Call Tr., Mar. 6, 2025.) Irvin attributed the Metals decline to "significantly lower levels of volatility in the market" and to the fact that Marex had "recorded a fair value adjustment to reflect the open risk positions at year-end, which we hold to service client demand compared to an immaterial adjustment in the prior year." (*Id.*) Lowitt added: "it's less a sort of indication of sort of underperformance in the business and more a function of almost sort of technical accounting that drives that particular number." (*Id.*) On the same call and on the same set of disclosures, Lowitt and Irvin identified and explained a specific accounting-driven cause for a Metals revenue movement. Neither offered any comparable explanation, accounting-driven, activity-driven, composition-driven, or otherwise, for the Securities Revenue increase of 206% against an 86% decline in the Financials Volume KPI appearing on the very same disclosures. The Securities divergence was materially larger than the Metals movement Defendants chose to explain. Their silence as to Securities, while disaggregating and explaining a smaller Metals movement on the same call, supports the inference that they knew the reason for the Securities inversion and chose not to say it.

47. Independently, Marex's own Class Period financial statements attributed to segments other than Market Making the very activities that Lowitt, on August 13, 2025, would describe as inside Market Making. Marex's 2024 Annual Report, furnished to the SEC as Exhibit 99.1 to a Form 6-K on March 21, 2025, stated in Note 18 to the financial statements: "Fixed income securities are corporate bonds which are invested in as a part of the Group's Agency and Execution

and Hedging and Investment Solutions segments." (2024 Annual Report, Note 18, at 202.) Note 32(c) of the same Annual Report stated: "Equity instruments are purchased primarily to facilitate the stock lending and borrowing business, which is part of the agency and execution business segment." (2024 Annual Report, Note 32(c), at 218.) The balance-sheet commentary in the same 2024 Annual Report likewise attributed stock-lending growth to Agency and Execution, stating that "Securities balances increased to $6.5bn, up $2.4bn from December 2023 driven by hedging activity to support our prime brokerage clients and increased stock lending activity within our Agency and Execution business." (2024 Annual Report at 35.) Those disclosures associated corporate bonds and stock lending with segments other than Market Making in Marex's own Class Period filings. On August 13, 2025, however, Lowitt told investors that the Market Making segment included "our corporate bond market making, stock loan, and various other activities." (Q2 2025 Earnings Call Tr., Aug. 13, 2025.)

48. That inconsistency is probative of scienter. If Lowitt's August 13, 2025 description reflected the same business mix that existed during the Class Period, then Marex's earlier filings did not fairly convey where stock lending and corporate bond activity sat within Marex's segment structure. If, instead, the composition of Market Making changed during or after the Class Period, Marex disclosed no such change and published no restatement of prior-period segment information. (IFRS 8.29–.30.) Under either reading, Lowitt and Irvin, who signed Marex's 2024 Form 20-F, served on Marex's Group Executive Committee, and were responsible for Marex's external segment reporting, cannot plausibly claim ignorance of the mismatch between the narrower Financials Volume KPI they published and the broader activity set Lowitt later described.

49. On April 2, 2025, Marex hosted an Investor Day at the Nasdaq MarketSite in New York. Senior leadership attended, including Lowitt, Irvin, and Paolo Tonucci, Chief Strategist and

CEO Capital Markets. (Marex Apr. 2, 2025 Form 6-K, Ex. 99.1.) The Investor Day materials, prepared and presented under Lowitt's and Irvin's oversight, depicted the Financials subsegment of Market Making as comprising an Equity sub-line (UK Small Cap Equity and Investment Trusts) and a Fixed Income sub-line (Corporate Bonds), totaling approximately 17% (approximately $36 million) of Market Making revenue. (Investor Day Deck, slide 47.) Each of the product lines so identified was an exchange-traded market making activity. The Investor Day Market Making materials did not disclose that stock lending, corporate bond market making beyond the listed Corporate Bonds desk, prime services, repo, or other Off-Exchange Activities of the kind Lowitt would later describe on August 13, 2025 were inside the Market Making segment.

50. A separate Investor Day slide identified representative customers for the Metals, Agriculture, and Energy & Environmentals subsegments of Market Making, but not for the Financials subsegment. (Investor Day Deck, slide 51.) Marex used the labels "Securities" and "Financials" interchangeably across the Investor Day materials and its quarterly earnings releases to refer to the same Market Making subsegment, and the approximately $36 million Financials subsegment figure disclosed at Investor Day is consistent, subject to rounding, with the full-year Market Making Securities revenue of $35.6 million reported in the FY 2024 Earnings Release. Yet Defendants did not tell investors at Investor Day that the Securities revenue reported in the Q3 2024 Earnings Release or the FY 2024 Earnings Release included material activity outside the Financials Volume KPI; did not retract or explain the paired KPI/revenue presentations in those prior releases; did not explain the implied per-contract economics that appeared on the face of the paired figures; and did not disclose the facts Lowitt would later confirm on August 13, 2025, including that the exchange-traded business the Financials Volume KPI measured was being wound down. Investors who had purchased Marex ordinary shares in reliance on the Q3 2024

Earnings Release and the FY 2024 Earnings Release had already paid inflated prices by the time Investor Day occurred.

51. Marex's own conduct in May 2025, when it discontinued the Financials Volume KPI, further supports the inference that Defendants knew the KPI had been misleading when paired with the Securities Revenues. On May 15, 2025, in the Q1 2025 Earnings Release, Marex silently removed all four Market Making volume rows (Metals, Agriculture, Energy, and Financials) that it had published alongside segment revenues in every prior Class Period quarterly release. (Q1 2025 Earnings Release, attached as Ex. 99.1 to Form 6-K filed May 15, 2025.) Marex offered no explanation for the removal, retracted no prior paired presentation, and corrected no prior volume-revenue inference it had invited. Marex made no corresponding change to Agency and Execution: for that segment, Marex continued to publish the rolling twelve-month "Marex volumes: Securities" and "Marex volumes: Energy" lines in the same release. (*Id.*) In the same Q1 2025 Earnings Release, Marex included a single sentence attributing Market Making – Securities revenue growth that quarter to "growth in stock lending, which complements our Prime Services offering within Agency and Execution." (*Id.*) Marex did not retract the prior paired Securities Revenue and Financials Volume KPI presentations, did not disclose that those prior presentations had been misleading, did not explain the removal of the Market Making volume rows, and did not reconcile the stock-lending attribution with the 2024 Annual Report, which placed stock lending in Agency and Execution rather than Market Making. (*See* 2024 Annual Report, Note 32(c), at 218.) On August 13, 2025, Lowitt stated that Marex had "removed this volume KPI in 2025 as we believed it was no longer a useful comparison to our revenue." (Q2 2025 Earnings Call Tr., Aug. 13, 2025.) A determination that a KPI is "no longer" a useful comparison implies a prior determination that it had been a useful comparison during the Class Period, when Marex had paired

it with Securities Revenues in the same tables. Three features of the May 15, 2025 change are probative: first, the selective removal of Market Making volume rows but not Agency and Execution volume rows; second, the contemporaneous addition of a narrow sentence attributing Securities Revenue to stock lending, without retraction of the prior paired presentations or disclosure that those presentations had been misleading; and third, Lowitt's subsequent statement that the KPI was no longer a useful comparison to revenue. Together, these features support the inference that Defendants removed the KPI because they knew it had been a misleading comparison to revenue, and removed it from the one segment where the mismatch had become indefensible while leaving in place analogous volume disclosures for segments where no such mismatch existed.

52. On the same May 15, 2025 call at which Marex released the Q1 2025 Earnings Release — the release in which Marex silently removed the Financials Volume KPI and the other Market Making volume rows from the Performance by Segment table without explanation — Lowitt's prepared remarks closed with the statement that the quarter had been strong because Marex had experienced "higher levels of activity and volumes that we were able to convert into revenue and profit growth." (Q1 2025 Earnings Call Tr., May 15, 2025.) Lowitt's prepared remarks affirmed to investors that higher volumes drove higher revenue and profit for Marex, the same volume-to-revenue causal relationship that the prior Class Period paired Market Making presentations had relied on. That Lowitt continued to invoke volume-to-revenue causation in Marex's prepared remarks on the very day Marex silently removed the Market Making volume rows from its quarterly reporting supports the inference that Defendants knew the removed volume line had been misleading when paired with Securities revenue and chose not to explain the removal.

53. On March 21, 2025, Lowitt and Irvin each executed the certifications required by Rule 13a-14 under the Exchange Act and Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 in connection with Marex's 2024 Form 20-F. (Form 20-F, filed Mar. 21, 2025, Exs. 12.1, 12.2, 13.1.) Each certified, based on his knowledge, that the Form 20-F did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that the financial statements contained in the filing fairly presented, in all material respects, the financial condition, results of operations, and cash flows of Marex. (*Id.*, Exs. 12.1, 12.2.) The 2024 Annual Report furnished as Exhibit 99.1 to the same-day Form 6-K (*see* ¶ 17 n.1) was the filing that contained the Note 18 and Note 32(c) attributions placing corporate bonds and stock lending in Agency and Execution rather than Market Making, the attributions Lowitt contradicted on August 13, 2025 by describing the same activities as inside Market Making. Lowitt and Irvin, who certified the filing, knew its segment attributions; they reviewed, signed, and certified what they signed.

54. Public SEC records reflect a concentrated sequence of insider sale notices filed by senior Marex executives in the ten days between Marex's March 6, 2025 FY 2024 Earnings Release and the March 21, 2025 filing of Marex's 2024 Form 20-F. Because Marex was a foreign private issuer during the relevant period, the public trading record for its officers is described on Forms 144, which are notices of proposed sale filed concurrently with the placement of a broker order.

55. On March 10, 2025, four days after Marex's FY 2024 Earnings Release reported the 206%/86% Securities/Volume KPI divergence, Simon Van Den Born, Marex's President, filed a Form 144 reporting the proposed brokered sale of 26,731 ordinary shares through Goldman

Sachs & Co. LLC, with an aggregate market value of $972,473.78. (Form 144 filed Mar. 10, 2025, Acc. No. 0001958244-25-001839.) The Form 144 identified the shares as compensation-based restricted stock units acquired on December 21, 2021 and did not identify any Rule 10b5-1 trading plan. On the same date, Paolo Roberto Tonucci, Marex's Chief Strategy Officer and Chief Executive Officer Capital Markets, filed a Form 144 reporting the proposed brokered sale of 100,000 ordinary shares through Goldman Sachs with an aggregate market value of $3,638,000.00 (Form 144 filed Mar. 10, 2025, Acc. No. 0001958244-25-001837), and Nilesh Kumar Jethwa filed a Form 144 reporting the proposed brokered sale of 299,473 ordinary shares through Goldman Sachs with an aggregate market value of $9,514,257.21 (Form 144 filed Mar. 10, 2025, Acc. No. 0001958244-25-001838). Neither the Tonucci Form 144 nor the Jethwa Form 144 identified a Rule 10b5-1 trading plan.

56. On March 12, 2025, nine days before Irvin executed the Rule 13a-14 and Sarbanes-Oxley certifications described above, Irvin filed a Form 144 reporting the proposed brokered sale of 2,477 ordinary shares through Goldman Sachs with an aggregate market value of $78,694.29. (Form 144 filed Mar. 12, 2025, Acc. No. 0001958244-25-001844.) The Form 144 identified the shares as compensation-based restricted stock units acquired on May 4, 2023 and did not identify any Rule 10b5-1 trading plan. Marex's own remuneration disclosures for fiscal year 2024 show Irvin's publicly disclosed vesting dates for outstanding scheme interests beginning in May 2025, not March 2025.

57. On March 14, 2025—two to four days after the Form 144s described above, and approximately five months before the August 5, 2025 NINGI Report—Van Den Born, Tonucci, Jethwa, and Lowitt each adopted Rule 10b5-1 trading plans. Subsequent Forms 144 filed under those plans reflect Van Den Born's June 16, 2025 proposed sale of 56,000 shares with aggregate

market value of $2,194,640.00, Tonucci's June 16, 2025 proposed sale of 66,672 shares with aggregate market value of $2,612,875.68, Jethwa's June 16, 2025 proposed sale of 60,920 shares with aggregate market value of $2,387,454.80, and Lowitt's June 23, 2025 proposed sale of 210,000 shares with aggregate market value of $8,219,400.00. (Forms 144 filed June 16 & 23, 2025.)

58. The sequence of four senior officers filing discretionary, non-plan Form 144 sale notices in a two-day window immediately before Marex's 2024 Form 20-F filing, followed days later by the uniform adoption of Rule 10b5-1 trading plans under which subsequent sales (including Lowitt's own) were executed, taken together with the other facts alleged in this section, adds to the inference that the officers who filed those notices were aware of the matters that made the challenged statements misleading at the time of the challenged statements.

59. Considered collectively, and taking into account plausible opposing inferences, the facts alleged in this section support a strong inference that Defendants knew, or recklessly disregarded, the matters that made the challenged statements materially false and misleading. The same facts support corporate scienter for Marex, because the Class Period statements were made, signed, certified, and, in the relevant post-Class-Period admissions, subsequently contradicted by Lowitt and Irvin, who are for purposes of this action the state of mind of Marex itself.

## CLASS ACTION ALLEGATIONS

60. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired Marex ordinary shares during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants; the current and former officers and directors of Marex during the Class Period; members of their immediate families and their legal representatives, heirs, successors, or assigns; any entity in which any Defendant has or had a

controlling interest; and the legal representatives, heirs, successors, and assigns of any excluded Person.

61. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Marex's ordinary shares actively traded on the Nasdaq Global Select Market. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least hundreds, and likely thousands, of Class members.

62. Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and other Class members each sustained damages as a result of the wrongful conduct complained of herein.

63. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

64. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether Defendants violated the Exchange Act; (b) whether statements made by Defendants during the Class Period misrepresented material facts about the business, operations, and financial condition of Marex; (c) whether Defendants acted with the requisite scienter; (d) whether the price of Marex's securities was artificially inflated during the Class Period; and (e) the appropriate measure of damages.

65. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. Because the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**PRESUMPTION OF RELIANCE**

66. At all relevant times, the market for Marex's ordinary shares was an efficient market for the following reasons, among others: (a) Marex's ordinary shares met the requirements for listing, and were listed and actively traded, on the Nasdaq Global Select Market, a highly efficient and automated market; (b) as a registrant with the SEC, Marex filed periodic reports with the SEC and Nasdaq; (c) Marex regularly communicated with public investors through established market communications mechanisms, including through regular disseminations of press releases on national circuits of major news-wire services and through other wide-ranging public disclosures, including communications with the financial press and other similar reporting services; and (d) Marex was followed by securities analysts employed by major brokerage firms who published reports disseminated to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67. As a result of the foregoing, the market for Marex's ordinary shares promptly digested current information regarding Marex from all publicly available sources and reflected such information in the price of Marex's ordinary shares. Under these circumstances, all purchasers of Marex's ordinary shares during the Class Period suffered similar injury through their purchase of Marex's ordinary shares at artificially inflated prices, and a presumption of reliance applies. Plaintiffs' claims are also supported by the presumption of reliance recognized in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the claims are grounded in part on Defendants' material omissions.

## FIRST CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

### (Against All Defendants)

68. Plaintiffs repeat and re-allege each and every allegation set forth above as though fully set forth herein.

69. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

70. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Marex's ordinary shares during the Class Period.

71. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Marex's ordinary shares. Plaintiffs and the Class would not have purchased Marex's ordinary shares at the prices they paid, or at all, had they been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

72. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of Marex's ordinary shares during the Class Period.

**SECOND CLAIM FOR RELIEF**

**Violation of Section 20(a) of the Exchange Act**

**(Against the Individual Defendants)**

73. Plaintiffs repeat and re-allege each and every allegation set forth above as though fully set forth herein.

74. Each of the Individual Defendants acted as a controlling person of Marex within the meaning of Section 20(a) of the Exchange Act. By reason of their positions as senior executive officers, their participation in and awareness of Marex's operations, and their intimate knowledge of the statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Marex, including the content and dissemination of the various statements alleged herein to be false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Marex's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

75. Each of the Individual Defendants culpably participated in the primary violation by personally making or causing the dissemination of the false and misleading statements alleged herein, by signing the 2024 Form 20-F and executing the Sarbanes-Oxley Sections 302 and 906 certifications with respect to the challenged financial statements, by speaking on each Class Period earnings call about the subjects of the challenged statements, and by taking or failing to take the actions set forth above with the requisite scienter.

76. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Marex and, therefore, is presumed to have had the

power to control or influence the particular statements giving rise to the securities violations alleged herein, and exercised the same.

77. As set forth above, Marex and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Marex's ordinary shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class Representatives, and designating Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims and issues so triable.

Dated: April 20, 2026

Respectfully submitted,

/s/ William Brody

Brian J. Schall (*pro hac vice* forthcoming)
William M. Brody (admitted *pro hac vice*)
Andrew J. Brown (*pro hac vice* forthcoming)
Adam L. Rosen (*pro hac vice* forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
Fax: (310) 388-0192
Email: brian@schallfirm.com
andrew@schallfirm.com
wbrody@schallfirm.com
adam@schallfirm.com

*Counsel for Lead Plaintiffs Ali Shahsavanpour and Jaimin Patel*

Adam J. Goldstein
**SPARACINO PLLC**
1920 L Street, NW
Washington, DC 20036
Tel.: (202) 629-3530
Email: adam.goldstein@sparacinopllc.com

*Local Counsel for Lead Plaintiffs Ali Shahsavanpour and Jaimin Patel*

**PROOF OF SERVICE**

I hereby certify that on this 20th day of April, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ William M. Brody*
William M. Brody